IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **DAVID WILCOX,** | : | **CIVIL DIVISION** |
| *Plaintiff,* | : | **Case No.: 2:26-cv-01738** |
| v. | : | |
| **ZERBE SISTERS NURSING CENTER, INC. d/b/a ZERBE RETIREMENT COMMUNITY; DANIEL CAFFREY; SUZETTE CAFFREY; SCOTT MANCINI; and NUTCOLA BRADLEY,** *jointly and severally,* | : | **JURY TRIAL DEMANDED** |
| *Defendants.* | : | |

## COMPLAINT IN CIVIL ACTION

AND NOW, comes Plaintiff, David Wilcox, by and through the undersigned counsel, J.P. Ward & Associates, LLC, and, specifically, Justin M. Bahorich, Esquire, who files the within Complaint in Civil Action against Defendants, Zerbe Sisters Nursing Center, Inc. d/b/a Zerbe Retirement Community; Daniel Caffrey; Suzette Caffrey; Scott Mancini; and Nutcola Bradley (collectively "Defendants"), jointly and severally, and in support thereof states as follows:

## PARTIES

1.      Plaintiff, David Wilcox ("Plaintiff" or "Mr. Wilcox"), is an adult individual who currently resides at 195 Linda Terrace, Ethrata, PA, 17522.

2.      Defendant, Zerbe Sisters Nursing Center, Inc. ("Defendant Corporation" or "Zerbe Sisters"), is a domestic business corporation with a principal place of business located at 2499 Zerbe Road, Narvon, PA 17555. At all times relevant hereto, Zerbe Sisters owned and operated a long-term care and retirement facility under the brand name "Zerbe Retirement Community," located at the same Narvon, PA location.

3.      Defendant, Daniel Caffrey ("Mr. Caffrey"), is an adult individual who currently resides at 540 Swamp Bridge Road, Denver, PA 17517. Mr. Caffrey is the sole Chief Executive Officer (CEO) and Owner of Zerbe Sisters.

4.      Defendant, Suzette Caffrey ("Ms. Caffrey"), is an adult individual who currently resides at 540 Swamp Bridge Road, Denver, PA 17517. Ms. Caffrey serves as the Resident Care Executive at Zerbe Sisters.

5.      Defendant, Scott Mancini ("Mr. Mancini"), is an adult individual who currently resides in Lancaster County, PA. Mr. Mancini serves as the primary Administrator of Zerbe Sisters.

6.      Defendant, Nutcola Bradley ("Ms. Bradley"), is an adult individual who currently resides at 103 Gibraltar Road, Reading, PA 19606. Ms. Bradley served as Director of Human Resources at the time of Mr. Wilcox's termination.

## JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction over Plaintiff's federal claim under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq., pursuant to 28 U.S.C. § 1331 and the False Claims Act ("FCA" – 31 U.S.C. §§ 3729 *et seq.*).

8.      The Court has supplemental jurisdiction over Plaintiff's related state-law claims brought under the Pennsylvania Adult Protective Services Act ("APSA"), 35 P.S. § 10210, et seq.; the Pennsylvania Older Adult Protective Services Act ("OAPSA"), 35 P.S. § 10225, et seq.; and the Pennsylvania Whistleblower Law ("PWL"), 43 P.S. § 1421, et seq., pursuant to 28 U.S.C. § 1367 because these claims arise from the same case or controversy as Plaintiff's federal claims.

9. Venue is proper under 28 U.S.C. § 1391(b) because Defendants reside in Pennsylvania and are subject to personal jurisdiction within this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this District.

10. Mr. Wilcox has timely dual-filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), and the Pennsylvania Human Relations Commission ("PHRC"), based on the same core events and conduct outlined in this Complaint

11. The administrative charge addresses related issues of disability discrimination, failure to accommodate, and retaliation under federal and state anti-discrimination statutes stemming from the same causal nexus of events.

## FACTUAL ALLEGATIONS

12. Plaintiff, David Wilcox, began his employment with Zerbe Sisters on or around February 27, 2023, and ultimately served as the Revenue Cycle Specialist, responsible for the billing and revenue functions of a skilled nursing and long-term care facility serving elderly and dependent residents.

13. Over the course of his employment, Mr. Wilcox consistently performed his job duties and was entrusted with increasing responsibility over the facility's billing, revenue cycle, and compliance-related functions.

14. As an element of his job duties, Mr. Wilcox was responsible for billing residents' accounts after Medicaid eligibility determinations were issued by the Lancaster County Assistance Office ("Lancaster CAO").

15. Case Coordinator Stephanie Miley ("Ms. Miley"), managed all Medicaid applications for residents and served as the facility's liaison to the Lancaster CAO.

3

### a. Medicaid, Medicare, and Billing Compliance Concerns

16.     During his employment, Mr. Wilcox observed multiple practices that raised concerns regarding the financial protection, care, and lawful treatment of residents, many of whom qualified as "older adults" and "care-dependent persons" under the Adult Protective Services Act ("APSA") and the Older Adult Protective Services Act ("OAPSA").

17.     Mr. Wilcox observed that on multiple occasions, the billing information he received following Lancaster CAO eligibility determinations did not align with eligibility documentation or determinations issued by the County.

18.     Mr. Wilcox thereafter became aware of practices carried out by Zerbe Sisters and Ms. Miley, in which family members were advised to move or rearrange resident funds prior to Medicaid redeterminations in a manner he reasonably believed was intended to create the appearance that residents lacked sufficient resources to qualify for Medicaid.

19.     In or around June - July 2025, after the Lancaster CAO sent a notice indicating that a resident's account exceeded Medicaid resource limits, Mr. Wilcox provided the notice to Ms. Miley in the course of his job duties.

20.     Mr. Wilcox later learned that Ms. Miley advised the resident's family member to move funds in response to the notice, which caused Mr. Wilcox concern regarding billing integrity and compliance.

21.     Mr. Wilcox raised concerns that inaccurate information was being used in the Medicaid application and redetermination process, which affected billing and compliance.

22.     These concerns included irregularities in Medicaid applications, outdated or inaccurate PA-162 determination letters, failures to follow required Medicaid redetermination

4

procedures, and instructions by staff to family members to withdraw resident funds prior to renewal periods to maintain Medicaid eligibility.

23. Mr. Wilcox also identified issues involving Medicare billing, including a claim that Defendants refused to submit to Medicare despite apparent eligibility, and other billing discrepancies impacting residents.

24. Mr. Wilcox reasonably believed these practices risked improper claims for payment to Medicare and Medicaid, and he raised concerns in the interest of preventing or remedying potential violations.

25. For example, Mr. Wilcox raised concerns internally and to appropriate agencies about Medicaid-related financial issues affecting resident accounts, and about a Medicare claim that a resident or family asked to have submitted, which Defendants resisted submitting to Medicare despite apparent eligibility.

26. Mr. Wilcox reported the Medicare billing concern to the Pennsylvania Office of Attorney General, and his supervisor was aware of that contact.

### b. **Resident Care and Provider Access Concerns**

27. Mr. Wilcox further observed and reported incidents relating to resident care, including an incident in which a resident's corrective eyeglasses were reported missing in or around early May 2025, but Defendants delayed taking steps to replace them and/or notify the provider until approximately late June 2025.

28. Mr. Wilcox reasonably believed the delay jeopardized resident health and safety and constituted neglect, and he reported the issue to the Department of Health and internally to management.

29.     Mr. Wilcox also reported concerns involving resident access to outside medical providers. At the resident's request, Mr. Wilcox printed a list of physicians within the resident's insurance network, and provided that list to the resident. Providing such information was consistent with the resident's right to seek care from a provider of her choosing.

30.     Thereafter, Mr. Mancini and Director of Nursing, Jennifer Boley ("Ms. Boley"), contacted Mr. Wilcox and criticized him for providing provider information to that resident, stating that the facility would not, or was otherwise unwilling, to transport residents to outside providers.

31.     In fact, in or around July 2025, Mr. Mancini and Ms. Boley called Mr. Wilcox into a meeting, during which they verbally reprimanded him for providing the resident with the insurance-based provider information upon that resident's request.

32.     Upon information and belief, Defendants did not want to incur transportation-related costs in providing transportation services to residents who wish to seek medical care from outside providers.

### c. **Reports to Government Agencies and Internal Management**

33.     Between approximately September 2024 and mid-2025, Mr. Wilcox made multiple good-faith reports to government agencies, including:

a)  The Pennsylvania Department of Human Services;

b)  The Lancaster County Assistance Office;

c)  The Pennsylvania Office of Attorney General;

d)  The Pennsylvania Office of Aging; and

e)  The Pennsylvania Department of Health.

34.     Mr. Wilcox made these reports because he reasonably believed Defendants were violating duties imposed under APSA, OAPSA, the Whistleblower Law, and various Medicaid/Medicare regulations.

35.     Contemporaneously, Mr. Wilcox reported the same concerns internally to management, including Mr. Mancini, Ms. Miley, and Mr. and Ms. Caffrey.

36.     Mr. Wilcox also requested to participate in training in Medicaid eligibility, billing requirements, and redetermination processes to ensure that his duties were performed in compliance with law; however, Defendants refused to include him in such training while simultaneously accusing him of errors. Instead, Defendants assured Mr. Wilcox that he would receive a "high-level overview" of the Medicaid process, but Defendants failed to provide any such overview prior to terminating him.

### d.  Escalating Hostility and Retaliatory Conduct

37.     Shortly after one of Mr. Wilcox's reports to the Department of Health, Defendant Administrator Scott Mancini gathered staff and stated that an employee was "trying to sabotage" or "trying to ruin" the facility.

38.     While making this statement, Mr. Mancini looked directly at Mr. Wilcox, which Mr. Wilcox reasonably understood to be a retaliatory reference to his protected reports.

39.     Mr. Wilcox later reported this remark to Ms. Bradley, who failed to take appropriate remedial action or to otherwise assuage Mr. Wilcox's reasonable concerns.

### e.  FMLA Leave and Subsequent Adverse Employment Actions

40.     In or around late December 2024, Mr. Wilcox exercised rights under the Family and Medical Leave Act ("FMLA") by requesting intermittent, medically supported leave, and his physician submitted the medically necessary paperwork to Human Resources.

41. Defendants approved intermittent FMLA leave for the period of December 16, 2024, through June 16, 2025. Mr. Wilcox submitted a second request for intermittent leave in or around July 2025.

42. Following Mr. Wilcox's protected reports and FMLA activity, Defendants' treatment of him changed significantly.

43. Rather than addressing the reported concerns, Defendants subjected Mr. Wilcox to heightened scrutiny, denied him advancement opportunities without justification, and repeatedly dismissed or ignored his documented concerns.

44. In or around April – May 2025, Mr. Wilcox applied for a director level position within Defendant Zerbe Sisters, for which he was qualified.

45. Accounting Manager Rachel Whitlatch ("Ms. Whitlatch") emailed Mr. Wilcox denying him the position, stating that Defendants were moving forward with other candidates "whose experience and qualifications more closely align" with their needs.

### f. Termination Following Protected Activity

46. On or around August 12, 2025, shortly after Mr. Wilcox's protected reports to DHS, the Pennsylvania Department of Health, and the Office of Attorney General, and shortly after his renewed intermittent FMLA request, Defendants abruptly terminated his employment.

47. In the termination letter provided to Mr. Wilcox, Defendants asserted that his employment was being terminated for vague "performance and workplace reasons," referenced unspecified "performance issues," and claimed that "formal counseling" had been provided on or around July 10, 2025 and on prior occasions, while accusing Mr. Wilcox of undertaking tasks outside his designated responsibilities and "venturing into workplace matters" allegedly beyond his knowledge or job description.

8

48. To the extent Defendants contend that any "formal counseling" occurred, such counseling did not include written discipline, a performance improvement plan, or any notice that Mr. Wilcox's employment was in jeopardy, nor did it identify specific performance deficiencies, objective expectations, or corrective measures.

49. Defendants had never issued Mr. Wilcox written warnings, progressive discipline, or notice that his job was in jeopardy, despite his successful performance and expanded responsibilities.

50. The termination letter's reference to alleged counseling in or around July 2025 appears consistent with, and may refer to, the July 2025 meeting in which Mr. Wilcox was verbally reprimanded for providing insurance-based provider information to a resident who requested it.

51. When Mr. Wilcox stated that he wanted an attorney to review the documents before signing, Ms. Bradley and Mr. Caffrey watched him as he packed his belongings, then escorted him out of the building through a back door and down a fire escape all the way to his car, in view of residents and staff, which was meant to humiliate him, and in a manner inconsistent with any legitimate performance-based termination.

52. As Mr. Wilcox was escorted to his car, Mr. Caffrey stated words to the effect of, "We'll see you in court," which Mr. Wilcox reasonably understood as retaliatory and in response to his protected activity.

53. Mr. Wilcox requested documentation supporting the alleged "performance issues." Defendants refused to provide such documentation and falsely asserted that prior discussions had occurred, which they had not.

54. Defendants' stated reasons for termination are pretextual. The timing of the discharge, the lack of any disciplinary history, the retaliatory statements by Mr. Mancini, and

9

Defendants' escalating hostility after Mr. Wilcox's protected reports and FMLA leave demonstrate that Defendants terminated him because he engaged in conduct protected by FCA, APSA, OAPSA, the Pennsylvania Whistleblower Law, and the FMLA.

**PARTICIPATION THEORY**
*Pled in connection with All Counts*

55.    The courts of this Commonwealth recognize the "participation theory," whereby, a corporate officer or representative who participates in wrongful, injury-producing conduct can be personally and individually liable while acting within the scope of their duty to the corporation. *Loeffler v. McShane*, 539 A.2d 876 (Pa. Super. Ct. 1988); *Moy v. Schreiber Deed Sec. Co.*, 535 A.2d 1168 (Pa. Super. Ct. 1988); *Amabile v. Auto Kleen Car Wash*, 376 A.2d 247 (Pa. Super. Ct. 1977).

56.    "Under the participation theory, the court imposes liability on the individual as an actor rather than as an owner. Such liability is not predicated on a finding that the corporation is a sham and a mere alter ego of the individual corporate officer." *Wicks v. Milzoco Builders, Inc.*, 470 A.2d 86, 90 (Pa. 1983).  Liability will attach where the record establishes the corporate officer's participation in the tortious activity. *Id.* "Thus, in order for liability to attach the officer must actually participate in wrongful acts." *Kaites v. Commonwealth, Dep't of Envtl. Res.*, 529 A.2d 1148, 1151 (Pa. Commw. Ct. 1987).

57.    Further, the fact that a corporation may be vicariously or secondarily liable under the doctrine of respondeat superior does not relieve the individual of their responsibility. *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978) (citing Zubik v. Zubik, 384 F.2d 267, 275 (3d Cir. 1967)). "Such an action may exist even though the agent or officer derived no personal benefit, but acted on behalf, and in the name of, the corporation and the corporation alone was

enriched by the act." *Shonberger v. Oswell*, 530 A.2d 112, 114 (Pa. Super. Ct. 1987) (citing *McDonald v. First Nat'l Bank*, 44 A.2d 265, 266 (Pa. 1945)).

58.    Further, liability under the PHRA extends to supervisory employees who "aid, abet, incite, compel or coerce the doing of any act declared ... to be an unlawful discriminatory practice." 43 Pa. Stat. § 955(e); *Dici v. Com. of Pa.*, 91 F.3d 542, 552-53 (3d Cir. 1996); *Delval v. Town of McCandless*, 2024 WL 1346670, at *8 (W.D. Pa. Mar. 29, 2024).

59.    Such conduct includes involvement in "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 429, 431.

60.    It is widely accepted that "'[w]hen a supervisory employee has knowledge of conduct which creates a hostile work environment, inaction by such an employee or failing to take prompt remedial action to prevent harassment rises to the level of individual aiding and abetting'" under the PHRA. *Delval* at *8 (citing *Hewitt v. BS Transportation of Illinois, LLC*, 355 F. Supp. 3d 227, 238 (E.D. Pa. 2019)).

61.    As owners of Zerbe Sisters with ultimate authority over personnel decisions, Defendants Daniel and Suzette Caffrey personally participated in the wrongful conduct at issue in this action by: (a) receiving and disregarding Plaintiff's reports of suspected abuse, neglect, financial impropriety, and regulatory violations; (b) failing to take corrective action after Plaintiff's good-faith reports to DHS, DOH, and the Office of Attorney General; (c) escalating scrutiny and hostility toward Plaintiff after he engaged in protected reporting and FMLA activity; and (d) approving, directing, or ratifying the retaliatory termination of Plaintiff on pretextual "performance" grounds shortly after his protected activity.

11

62.     Defendant, Mr. Mancini, as Administrator with supervisory authority over Plaintiff, personally participated in and knowingly tolerated the wrongful conduct by: (a) making retaliatory statements to staff suggesting that an employee, while looking directly at Plaintiff, was "trying to sabotage" or "ruin" the facility following Plaintiff's protected reports; (b) refusing to include Plaintiff in Medicaid and compliance-related training while simultaneously blaming him for errors caused by lack of access; and (c) participating in or endorsing the pretextual termination decision in retaliation for Plaintiff's protected reporting and FMLA leave.

63.     Defendant, Ms. Bradley, as Human Resources Director, personally participated in and aided and abetted the wrongful conduct by: (a) receiving Plaintiff's documented reports of abuse, neglect, financial irregularities, and retaliation; (b) minimizing, dismissing, or failing to investigate these reports in good faith; (c) failing to take corrective action required under APSA, OAPSA, and internal policy; and (d) jointly carrying out Plaintiff's retaliatory termination with the Caffreys and Mancini.

64.     Through the actions described above, Defendants Daniel and Suzette Caffrey, Mancini, and Bradley each personally participated in, directed, authorized, and/or ratified the retaliatory and unlawful conduct giving rise to Plaintiff's claims under the FMLA, APSA, OAPSA, the Pennsylvania Whistleblower Law, and Pennsylvania public policy. Accordingly, each individual Defendant is personally liable under the participation theory.

## COUNT I
### FMLA RETALIATION
*(Plaintiff v. All Defendants, jointly and severally)*

65.     Mr. Wilcox incorporates the allegations contained in the paragraphs above as fully set forth herein.

66.     The FMLA provides in pertinent part, "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" these rights, violation of which is known as FMLA retaliation. *Lichtenstein v. U. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 307 (3d Cir. 2012) (citing 29 U.S.C. § 2615(a)(1)).

67.     The Department of Labor defines an "employer" under the FMLA as including "any person acting, directly or indirectly, in the interest of a covered employer to any of the employees of the employer, any successor in interest of a covered employer, and any public agency." 29 C.F.R. § 825.104(a).

68.     "The regulations then explicitly provide that 'individuals such as corporate officers acting in the interest of an employer are individually liable for any violations of the requirements of FMLA.'" *Haybarger v. Lawrence County Adult Prob. & Parole*, 667 F.3d 408, 414 (3d Cir. 2012) (quoting 29 C.F.R. § 825.104(d)).

69.     To prevail on a claim of FMLA retaliation, the plaintiff must prove that "(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." *Lichtenstein*, 2012 WL 3140350 at *6 (3d Cir. Aug. 3, 2012).

70.     Moreover, an employee does not need to prove that invoking FMLA rights was the sole or most important factor upon which the employer acted." *Lichtenstein*, 691 F.3d at 301.

71.     Defendants are qualified employers under the FMLA.

72.     As an employee of Defendants, Plaintiff was entitled to leave pursuant to the FMLA.

73.    Plaintiff engaged in protected activity when he invoked FMLA protection by requesting and receiving intermittent, medically supported leave for his serious health conditions, and when he submitted a renewed request for intermittent leave in July 2025.

74.    Shortly after Plaintiff exercised his FMLA rights and renewed his intermittent leave request, Defendants escalated their scrutiny of his work, denied him advancement opportunities without justification, dismissed his documented concerns, and treated him with increasing hostility.

75.    On August 12, 2025, Defendants terminated Plaintiff's employment on vague and unidentified "performance" grounds, despite never issuing him prior discipline or warning of any kind.

76.    The close temporal proximity between Plaintiff's FMLA-protected activity and his termination, combined with Defendants' inconsistent explanations, lack of documented performance issues, and departure from normal disciplinary practices, supports a strong inference of retaliatory motive in violation of 29 U.S.C. § 2615(a)(2).

77.    As a direct and proximate result of Defendants' conduct, Mr. Wilcox suffered actual damages including but not limited to lost wages and benefits, severe emotional distress and anxiety, and acute inconvenience all in the past, present, and anticipated future.

78.    As set forth hereinabove, Defendants' actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience.

WHEREFORE, Plaintiff, David Wilcox, hereby requests that this Honorable Court consider the above and grant relief in his favor against all Defendants, jointly and severally, and award her back pay, front pay, liquidated damages, compensatory and punitive damages, pre-

judgement and continuing interest as calculated by the Court, and reasonable attorney's fees and costs.

## COUNT II
### INTIMIDATION AND RETALIATION
### IN VIOLATION OF THE ADULT PROTECTIVE SERVICES ACT
*Plaintiff v. All Defendants, jointly and severally*

79.    Mr. Wilcox incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

80.    In 2010, the Adult Protective Services Act ("APSA") was enacted to protect adults between the ages of 18 and 59 with a physical or mental disability that limits one or more major life activities. The APSA establishes a program of protective services under the DHS in order to detect, prevent, reduce and eliminate abuse, neglect, exploitation, and abandonment of these adults in need. 35 P.S. § 10210.101.

81.    It is declared the policy of this Commonwealth that:

> (1) Adults who lack the capacity to protect themselves and are at imminent risk of abuse, neglect, exploitation or abandonment must have access to services necessary to protect their health, safety and welfare.
> . . .
> (4) Information about protective services should be provided in a safe place and in a safe, understandable and responsive manner.
>
> (5) The Commonwealth must provide for the detection, prevention, reduction and elimination of abuse, neglect, exploitation and abandonment and establish a program of protective services for adults in need of them.

35  P.S. § 10210.102.

82.    Section 10210.501, Reporting by employees, subsection (a)(1), states that "An employee or an administrator who has reasonable cause to suspect that a recipient is a victim of abuse or neglect shall immediately make an oral report to an agency. If applicable, the agency shall

15

advise the employee or administrator of additional reporting requirements that may pertain under subsection (b). An employee shall notify the administrator immediately following the report to the agency." Id.

83. The APSA functions as a direct extension of the PWL, as stated in its whistleblower provision, "A person required under this act to report a case of suspected abuse or neglect shall not be subject to any retaliatory action for reporting suspected abuse or neglect and shall have the protections and remedies set forth in the act of December 12, 1986 (P.L.1559, No.169), known as the Whistleblower Law." 35 P.S. § 10210.506.

84. The APSA defines abuse as "the willful deprivation by a caregiver of goods or services which are necessary to maintain physical or mental health." 35 P.S. § 10210.103.

85. The APSA defines neglect as "the failure to provide for oneself or the failure of a caregiver to provide goods, care or services essential to avoid a clear and serious threat to the physical or mental health of an adult." *Id*.

86. Further, pursuant to Section 10210.302(a), "A person having reasonable cause to believe that an adult is in need of protective services may report such information to the agency."

87. Section 302 expressly prohibits retaliation and intimidation against persons who make reports of suspected abuse and neglect. The Act contains provisions providing for a civil cause of action against persons who engage in retaliation and intimidation against reporters.

88. Pursuant to Section 302, Reporting:

(d) Retaliatory action.-

> (1) Any person who makes a report or cooperates with the agency, including providing testimony in any administrative or judicial proceeding, and any adult in need of protective services shall not be subject to any discriminatory, retaliatory or disciplinary action by an employer or by any other person or entity.

16

(2) Any person who violates this subsection is subject to a civil action by the reporter or the adult in need of protective services, in which action the reporter or adult in need of protective services shall recover treble compensatory damages, compensatory and punitive damages or $5,000, whichever is greater.

(e) Intimidation.-

(1) A person, including an adult in need of protective services, with knowledge sufficient to justify making a report or cooperating with an agency, including possibly providing testimony in an administrative or judicial proceeding, shall not be subject to any intimidation by an employer or by any other person or entity.

(2) A person who violates this subsection is subject to civil action by the reporter or the adult in need of protective services, in which action the reporter or adult in need of protective services shall recover treble compensatory damages, compensatory and punitive damages or $5,000, whichever is greater.

35 P.S. § 10210.302.

89.    Mr. Wilcox engaged in protected activity under APSA when he made multiple good-faith reports of suspected abuse, neglect, and financial exploitation involving vulnerable adult residents, including irregularities in Medicaid redeterminations, improper handling of resident funds, and failures to provide necessary services such as corrective eyeglasses.

90.    Mr. Wilcox also made protected reports to government agencies, including DHS, the Lancaster County Assistance Office, the Pennsylvania Office of Attorney General, and the Department of Health, regarding conduct he reasonably believed constituted abuse, neglect, exploitation, or violations of resident-protection regulations.

91.    As a direct result of his protected APSA activity, Defendants engaged in intimidation and retaliation against Mr. Wilcox, including but not limited to: escalating scrutiny of his work, excluding him from necessary Medicaid compliance training, dismissing his

documented concerns, publicly denigrating him as someone "trying to sabotage" or "ruin" the facility, and ultimately terminating his employment on pretextual grounds.

92.     Defendant Administrator Scott Mancini's statements and conduct, particularly the meeting in which he accused an unnamed employee of sabotage while looking directly at Mr. Wilcox, constituted retaliatory intimidation prohibited by APSA.

93.     Defendants' retaliatory conduct culminated in the termination of Mr. Wilcox's employment on August 12, 2025, shortly after his protected reports triggered agency involvement and regulatory attention.

94.     But for Mr. Wilcox's good-faith reports of suspected abuse, neglect, and exploitation, Defendants would not have subjected him to intimidation, retaliation, exclusion, escalated scrutiny, and termination.

95.     As a direct and proximate result of the aforementioned conduct, Mr. Wilcox suffered actual damages, including, but not limited to, lost wages, benefits, loss of professional opportunities, harm to reputation, humiliation, mental anguish, and emotional distress, all in the past, present, and future.

96.     Defendants' conduct was willful, wanton and reckless such that an award of punitive damages is warranted.

WHEREFORE, Plaintiff, David Wilcox, hereby requests this Honorable Court consider the above and grant relief in his favor and against all Defendants, jointly and severally, including an award of back pay, front pay, treble compensatory damages, compensatory and punitive damages, costs and reasonable attorney's fees, in addition to any such relief as deemed just and proper.

18

## COUNT III
## INTIMIDATION AND RETALIATION
## IN VIOLATION OF THE OLDER ADULT PROTECTIVE SERVICES ACT
### *Plaintiff v. All Defendants, jointly and severally*

97.    Mr. Wilcox incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

98.    The Pennsylvania Older Adult Protective Services Act ("OAPSA") 35 Pa. Stat. Ann. § 10225.302 (a) and (c-c.1) read as follows:

(a)    Reporting.--Any person having reasonable cause to believe that an older adult is in need of protective services may report such information to the agency which is the local provider of protective services. Where applicable, reports shall comply with the provisions of Chapter 7.
…

(c)    Retaliatory action; penalty.--Any person making a report or cooperating with the agency, including providing testimony in any administrative or judicial proceeding, and the victim shall be free from any discriminatory, retaliatory or disciplinary action by an employer or by any other person or entity. Any person who violates this subsection is subject to a civil lawsuit by the reporter or the victim wherein the reporter or victim shall recover treble compensatory damages, compensatory and punitive damages or $5,000, whichever is greater.

(c.1)    Intimidation; penalty.--Any person, including the victim, with knowledge sufficient to justify making a report or cooperating with the agency, including possibly providing testimony in any administrative or judicial proceeding, shall be free from any intimidation by an employer or by any other person or entity. Any person who violates this subsection is subject to civil lawsuit by the person intimidated or the victim wherein the person intimidated or the victim shall recover treble compensatory damages, compensatory and punitive damages or $5,000, whichever is greater.

99.    The residents served by Defendants include "older adults" and "care-dependent persons" who fall within OAPSA's scope of protection.

19

100. Throughout his employment, Mr. Wilcox observed serious concerns regarding the care, treatment, financial protection, and lawful handling of older adult residents, including: (a) failures to ensure accurate and timely Medicaid redeterminations; (b) instructions to family members to withdraw resident funds in order to manipulate Medicaid eligibility; (c) failures to submit Medicare-eligible claims; and (d) delays or failures to provide medically necessary items such as corrective eyeglasses.

101. Mr. Wilcox reasonably believed that these practices constituted neglect, exploitation, or improper care of older adult residents requiring protective services.

102. Between approximately September 2024 and mid-2025, Mr. Wilcox made good-faith reports of these concerns to multiple government agencies, including the Pennsylvania Department of Human Services, the Lancaster County Assistance Office, the Pennsylvania Office of Attorney General, and the Pennsylvania Department of Health.

103. Mr. Wilcox's reports constituted protected activity under OAPSA because he made them in good faith, cooperated with investigative entities, and provided information regarding older adults who he reasonably believed were in need of protective services.

104. As a direct result of his protected reports, Defendants engaged in intimidation and retaliation against Mr. Wilcox, including but not limited to: escalating scrutiny of his work, excluding him from necessary Medicaid-related training, dismissing his documented concerns, and publicly suggesting, through Defendant Mancini, that he was "trying to sabotage" or "ruin" the facility.

105. Defendants' retaliatory conduct culminated in the termination of Mr. Wilcox's employment on August 12, 2025, shortly after his protected reports triggered the involvement of DHS, DOH, and the Office of Attorney General.

20

106.    But for Mr. Wilcox's protected reports under OAPSA, Defendants would not have subjected him to intimidation, retaliation, escalating hostility, and eventual termination.

107.    As a direct and proximate result of the aforementioned conduct, Mr. Wilcox suffered actual damages, including, but not limited to, lost wages, benefits, loss of professional opportunities, harm to reputation, humiliation, mental anguish, and emotional distress, all in the past, present, and future.

108.    Defendants' conduct was willful, wanton and reckless such that an award of punitive damages is warranted.

WHEREFORE, Plaintiff, David Wilcox, hereby requests this Honorable Court consider the above and grant relief in his favor and against all Defendants, jointly and severally, including an award of back pay, front pay, treble compensatory damages, compensatory and punitive damages, costs and reasonable attorney's fees, in addition to any such relief as deemed just and proper.

## COUNT IV
## RETALIATORY TERMINATION
## IN VIOLATION OF THE PENNSYLVANIA WHISTLEBLOWER LAW
### *Plaintiff v. All Defendants, jointly and severally*

109.    Mr. Wilcox incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

110.    The Pennsylvania Whistleblower Law ("PWL") states, "No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing

or waste by a public body or an instance of waste by any other employer as defined in this act." 43 P.S. § 1423(a).

111.    The PWL is "chiefly a remedial measure intended to enhance openness in government and compel the government's compliance with the law by protecting those who inform authorities of wrongdoing." *Saltzman v. Thomas Jefferson Univ. Hosps., Inc.*, 166 A. 3d 465, 475 (Pa. Super. 2017).

112.    Under 43 P.S. §1423(b), "the reported wrongdoing must either be that of the employer or a violation of a law or code of conduct that the employer is charged to enforce for the good of the public." *Sea v. Seif*, 831 A.2d 1288, 1292 (Pa. Commw. Ct. 2003).

113.    The PWL defines an appropriate authority as "a federal, state, or local government body, agency, or organization having jurisdiction over criminal law enforcement, regulatory violations, professional conduct or ethics, or waste; or a member, officer, agent, representative or supervisory employee of the body, agency, or organization." 43 P.S. § 1422.

114.    Defendants are "employers" within the meaning of the PWL because they receive public funding and participate in publicly financed programs, including Medicaid and Medicare reimbursement systems administered by the Commonwealth of Pennsylvania.

115.    During the course of his employment, Mr. Wilcox made multiple good-faith reports of "wrongdoing" and "waste," including: (a) failures to comply with Medicaid and Medicare regulations; (b) improper handling of resident funds intended to influence Medicaid eligibility; (c) failures to ensure residents received medically necessary care and services; and (d) misrepresentations and irregularities involving government-funded reimbursement systems.

116.    Mr. Wilcox made these reports both internally, to management, HR, supervisory personnel, and externally to "appropriate authorities," including: (a) the Pennsylvania Department

22

of Human Services; (b) the Lancaster County Assistance Office; (c) the Pennsylvania Office of Attorney General; and (d) the Pennsylvania Department of Health.

117. Mr. Wilcox's reports constitute protected activity under the PWL because they were made in good faith, involved alleged violations of statutes and regulations governing the care and protection of vulnerable adults, and were reported to agencies with jurisdiction over healthcare compliance, public funds, and resident safety.

118. As a direct result of his protected Whistleblower activity, Defendants engaged in a pattern of intimidation and retaliation, including but not limited to: escalating scrutiny of his performance, excluding him from necessary training, dismissing his documented concerns, generating a hostile and accusatory environment, and publicly suggesting that he was "trying to sabotage" or "ruin" the facility.

119. Defendants' retaliatory conduct culminated in the termination of Mr. Wilcox's employment on August 12, 2025, less than two months after he renewed intermittent FMLA leave and after multiple government agencies began reviewing the issues he reported.

120. The timing of the termination, the lack of any prior discipline, Defendants' inconsistent explanations, and the increase in hostility following Mr. Wilcox's protected reports all support a strong inference of retaliatory motive.

121. But for Mr. Wilcox's protected reports of wrongdoing and waste under the PWL, Defendants would not have subjected him to intimidation, retaliation, escalating hostility, exclusion, or termination.

122. Defendants' actions were intentional, knowing, willful, wanton, and in reckless disregard of Mr. Wilcox's statutory rights under the PWL.

23

123.    As a direct and proximate result of the aforementioned conduct, Ms. Snow suffered actual damages, including, but not limited to, lost wages, benefits, loss of professional opportunities, harm to reputation, humiliation, mental anguish, and emotional distress, all in the past, present, and future.

WHEREFORE, Plaintiff, David Wilcox, hereby requests this Honorable Court consider the above and grant relief in his favor and against all Defendants, jointly and severally, including an award of backpay, front pay, any other compensatory damages, costs and reasonable attorney's fees, in addition to any such relief as deemed just and proper.

**COUNT V**
**RETALIATION IN VIOLATION OF**
**THE FALSE CLAIMS ACT**
***(Plaintiff v. All Defendants, jointly and severally)***

124.    The False Claims Act provides, in pertinent part, that a person who: (a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment of approval; (a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;(a)(1)(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G). (a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government…31 U.S.C. § 3729.

125.    The False Claims Act contains an anti-retaliation provision, which states: "Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and

conditions of employment because of lawful acts done by the employee, contractor, agent, or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1).

126.    A *prima facie* claim under the retaliation provision requires a plaintiff to show that: (1) he engaged in "protected conduct," (i.e. acts done in furtherance of an action under § 3730) and (2) that he was discriminated against because of his "protected conduct." *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176 (3d Cir. 2001) (*Citing United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998) (internal quotation omitted)).

127.    To prove discrimination "because of" conduct in furtherance of a False Claims Act suit, a plaintiff must show that (1) his employer had knowledge he was engaged in "protected conduct"; and (2) that his employer's retaliation was motivated, at least in part, by the employee's engaging in "protected conduct." *Id.*; *See also, Zahodnick v. Int'l Bus. Machines Corp.*, 135 F.3d 911, 914 (4th Cir. 1997).

128.    Defendants submitted claims for payment to the United States through their Medicare and Medicaid programs in connection with services provided for its client services.

129.    Plaintiff engaged in protected activity by reporting billing and compliance issues both internally and to the appropriate agencies, including a Medicare claim that a resident requested be submitted that Defendants resisted submitting despite its eligibility, and Medicaid-related eligibility and billing practices that Plaintiff reasonably believed posed risks of improper claims for payment.

130.    Plaintiff was retaliated against when he was terminated in close proximity to his protected reports to external agencies and internal management made in good faith to prevent or remedy potential violations.

131.   The retaliation was motivated, at least in part, by Plaintiff's protected activity concerning Medicare and Medicaid billing integrity and compliance, for which Defendants received payments from the federal government.

132.   Defendants' actions were intentional, willful, wanton, callous, and done in reckless disregard to the rights of others.

133.    As a direct and proximate result of the aforementioned conduct, Mr. Wilcox suffered actual damages, including, but not limited to, lost wages, benefits, loss of professional opportunities, harm to reputation, humiliation, mental anguish, and emotional distress, all in the past, present, and future.

WHEREFORE, Plaintiff David Wilcox, hereby requests this Honorable Court consider the above and grant relief in Plaintiff's favor and against all Defendants, jointly and severally, including back pay, front pay, compensatory and punitive damages, costs and reasonable attorney's fees, in addition to any such relief as deemed just and proper.

## JURY TRIAL DEMAND

Pursuant to the Seventh Amendment to the United States Constitution and Rule 38 of the Federal Rules of Civil Procedure, Plaintiff David Wilcox hereby demands a trial by jury on all issues of fact and claims for legal relief so triable as of right.  Plaintiff acknowledges that certain issues, including equitable remedies such as back pay, front pay, and injunctive relief, may be determined by the Court consistent with *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311 (3d Cir. 2006) and applicable law.  Plaintiff respectfully requests that a jury be empaneled to determine all factual and legal issues properly within its province, including liability, compensatory damages, and punitive damages, and that the Court determine equitable relief as appropriate.

Respectfully submitted,

**J.P. WARD & ASSOCIATES, LLC**

Date: March 17, 2026                    By: _____

Justin M. Bahorich, Esq.
Pa. ID 329207
The Rubicon Building
201 South Highland Avenue
Suite 201
Pittsburgh, PA 15206
jbahorich@jpward.com

*Counsel for Plaintiff*

27